# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PAUL S. RANGEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   No. 10-1359-CM–KGG |
| | ) |
| SANOFI-AVENTIS U.S., LLC, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM AND ORDER

Plaintiff Paul "Steve" Rangel brings this action against defendants sanofi-aventis U.S., LLC, and sanofi-aventis U.S., Inc., (collectively, "defendant") alleging discrimination and retaliation in violation of the Age Discrimination in Employment Act, (the "ADEA"), 29 U.S.C. § 621, *et seq*. Before the court is Defendants' Motion for Summary Judgment (Doc. 24). In short, defendant argues that plaintiff was terminated as part of a reduction in force based on repeated poor performance evaluations. Plaintiff argues that, despite his consistently demonstrating excellent performance, defendant terminated plaintiff three months after plaintiff filed a discrimination claim with the Kansas Human Rights Commission ("KHRC"), which he did after receiving no response to his internal complaints of discriminatory treatment by his superior, Shelly Soupir.

Because plaintiff cannot prove his prima facie case or establish pretext, the court grants defendant's motion.

## I.      Factual and Procedural Background[1]

---

[1] The court construes the facts in the light most favorable to the non-moving party pursuant to
(continued...)

Plaintiff was a sales professional with a sanofi-aventis predecessor, and worked as an Executive Sales Professional for sanofi-aventis from 2000 through December 30, 2008.  From about September 2006 through June 2008, he was directly supervised by District Sales Manager Shelly Soupir.  After June 2008 until his separation from employment in December 2008, plaintiff was supervised by District Sales Manager Greg Ford.  At all material times, sanofi-aventis was an "employer" as defined by the ADEA.

Defendant issued new "Sales Professionals Procedures and Expectations" guidance effective January 1, 2006.  (Doc. 25-2.)  These procedures, which applied to all sales teams nationwide, emphasized a variety of topics in evaluating sales professionals' performance, including work day; sales calls/presentation; electronic call reporting of sales call activity; call planning; call continuum; sampling activity; communication; and teamwork.  Defendant argues that plaintiff's sales style prior to that point was largely amiable and unstructured.  Although plaintiff and the team to which he was assigned exhibited strong sales rankings, both Ms. Soupir and Mr. Ford repeatedly documented deficiencies in plaintiff's ability to implement defendant's new procedures and expectations.[2]

In October of 2007, plaintiff received a Coaching Letter from Ms. Soupir.  On November 7, 2007, and again on January 23, 2008, plaintiff received Field Coaching Reports concerning ride-alongs with Ms. Soupir and plaintiff's performance.  On February 1, 2008, plaintiff received a

---

[1] (...continued)
Fed. R. Civ. P. 56.  The court has combined the facts stipulated to and proposed by both parties and has included only those that are relevant, material, and properly supported by the record.

[2]  Defendant groups its sales professionals in "pods" assigned to call on the same physicians in a geographic area.  Defendant offers evidence that, because of the shared nature of sales responsibilities, it was difficult to accurately determine an individual's sales performance, as opposed to the team.  For purposes of this memorandum and order, the court assumes that plaintiff's individual sales numbers were strong.

memorandum from Ms. Soupir concerning plaintiff's performance and his October 2007 Coaching

Letter.  On May 13, 2008, plaintiff received his 2007 Performance Review, in which he received a

"Below" rating.  On May 29, 2008, plaintiff received a Final Written Plan from Ms. Soupir.  On June

13, 2008, plaintiff faxed his letter response to the Final Written Plan to Richard Kaplan in

defendant's human resources department.  On June 26, 2008, plaintiff received a Field Ride Follow

Up memorandum from his new District Sales Manager, Greg Ford.  On July 15, 2008, plaintiff

received a Follow Up to Sales Reports Review memorandum from Mr. Ford.  On July 23, 2008,

plaintiff received a memorandum from Mr. Ford concerning follow-up to his Final Written Plan.  On

August 22, 2008, plaintiff received a Field Ride Follow Up memorandum from Mr. Ford.

On or about  September 16, 2008, plaintiff filed his initial charge with the Kansas Human

Rights Commission ("KHRC"), alleging that he had been subjected to unlawful discrimination based

on his age.  The complaint was dual-filed with the Equal Employment Opportunity Commission

("EEOC").

On September 19, 2008, plaintiff received a Field Ride Follow Up memorandum from Mr.

Ford.  On October 9, 2008, plaintiff received his 2008 Mid-Year Review, which contained a

"Below" rating.

On December 1, 2008, defendant informed plaintiff that his employment would end on

December 30, 2008.  At the time of his termination, plaintiff was 61 years of age.  After his lay-off,

plaintiff filed an amended complaint with the KHRC and EEOC alleging additional age

discrimination and unlawful retaliation for his having participated in protected activity.

Each of the Soupir reports, reviews, letters, memoranda, and plans were critical of plaintiff's

performance under the guidelines.  To a large extent, so were the Ford reports.  It was because of his

"below" rating for 2007 and the fact that he was on a Final Written Plan trending toward a "below"

rating for 2008 that he was included in defendant's December 2008 Reduction In Force ("RIF").

Plaintiff argues these negative assessments were not warranted: he had "stellar" sales numbers and

was performing his duties as a pharmaceutical sales representative at a level which placed him in the

top one percent worldwide for 2008.  (Doc. 34 at 34.)  He alleges that Ms. Soupir questioned when

plaintiff intended to retire, had a desire to get rid of plaintiff, and set about to make it happen.[3]  (*See*

Doc. 35-3 at 10.)  He also notes that he was terminated within three months of filing his

discrimination charge, giving rise to an inference that he was terminated in retaliation for engaging in

a protected activity.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine

dispute as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  In applying this standard, the court views the evidence and all reasonable inferences

therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal–Mart Stores, Inc.*, 144

F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986)).  Factual assertions must be supported by citation to "materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

## III.    Discussion

The ADEA provides that "it shall be unlawful for an employer . . . to discharge any

individual or otherwise discriminate against any individual with respect to his compensation, terms,

_____

[3]  Ms. Soupir denies this.

-4-

conditions, or privileges of employment, because of such individual's age . . . ."  29 U.S.C. §

623(a)(1).  To prevail on an ADEA claim, plaintiff  "must establish that age was a determining factor

in the employer's challenged decision."  *Lucas v. Dover*, 857 F.2d 1397, 1400 (10th Cir. 1988)

(quoting *EEOC v. Sperry Corp.*, 852 F.2d 503, 507 (10th Cir. 1988)).  Indeed, plaintiff must show

that age was the "but for" cause of his termination.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167,

129 S. Ct. 2343, 2351 (2009).

　　　　As in this case, where direct evidence of discrimination is absent, age discrimination claims

are to be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973).  *See Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008).  Under

this framework, the plaintiff must initially establish a prima facie case of discriminatory discharge.

Then, defendant must offer a legitimate, nondiscriminatory reason for its employment decisions.

*Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).  If defendant does so, then the burden

reverts to plaintiff "to show that there is a genuine dispute of material fact as to whether the

employer's proffered reason for the challenged action is pretextual *i.e.*, unworthy of belief."  *Marx v.*

*Schnuck Mkts., Inc.*, 76 F.3d 324, 327 (10th Cir. 1996).

### A.　　Prima Facie Claim

#### 1.　　Discrimination Claim

　　　　To establish a prima facie case of age discrimination, plaintiff must prove: (1) he is within

the protected age group; (2) he was doing satisfactory work; (3) he was discharged despite the

adequacy of his work; and (4) has some evidence the employer intended to discriminate against him

or her in reaching its RIF decision.  *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th

Cir. 2008) (setting out the burden to establish a prima facie case for an ADEA plaintiff affected by a

reduction in force).

Defendant focuses on plaintiff's ability to establish the fourth element. The Tenth Circuit has held that the fourth element may be satisfied by a showing that, during the RIF, the employer discharged the plaintiff but retained or placed a younger employee in a similar position. *Id.* This fourth element may be established by circumstantial evidence. *Id.*; *see also Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1138 (10th Cir. 2000).

In support of this fourth factor, plaintiff argues that (1) he was told he was being terminated on December 1, three days before the corporate RIF was announced, therefore his termination must have been separate from that action; (2) the statistics defendant offers regarding the effect of the RIF pertain only to the General Therapeutic Business Unit, not the Metabolism Business Unit ("MBU"), to which plaintiff was assigned until shortly before his termination; (3) regardless, the statistics do not indicate the relative sales rankings of the persons who were selected for the RIF, and it is doubtful that other sales reps in the top one percent of sales reps worldwide were targeted for reduction. Plaintiff does not argue—or offer any evidence—that younger employees in similar positions fared better under the RIF.

Defendant's 2008 RIF was a uniformly applied, nationwide RIF. Pursuant to it, all sanofi-aventis primary care sales professionals that had either (a) "below" or "less than" performance ratings in two out of three years between 2005 and 2007 or (b) "below" or "less than" ratings in 2007 and were trending towards a "below" or "less than" rating for 2008, were separated from employment effective December 30, 2008. (Doc. 25-1 at 3.)

The statistics defendant offers for how the RIF affected plaintiff's sales team are not controverted. And they clearly demonstrate that younger workers were not treated more favorably under the RIF. For example, plaintiff's work group, the General Therapeutics Business Unit – Southwest ("GTSW"), contained 285 salespeople. Twelve people were displaced as a result of the

RIF.  At the time of the RIF, 61% of GTSW representatives were under the age of 40.  After the RIF, 61% were under the age of 40.  At the time of the RIF, approximately 39% of the GTSW sales representatives were age 40 or over.  After the RIF, approximately 39% of the GTSW sales representatives were age 40 or over.  At the time of the RIF, approximately 16% of the GTSW sales representatives were age 50 or over.  After the RIF, approximately 16% of the GTSW sales representatives were age 50 or over.  (*See* Doc. 25-1 at 4–5.)

Plaintiff attempts to argue that the statistics provided are not the statistics that matter.  He argues defendants failed to provide statistics for the MBU, which was the group to which plaintiff was assigned until June of 2008.  It was while working in the MBU group that plaintiff allegedly suffered discrimination.  However, even if statistics for the MBU group were available, the basis for plaintiff's claim of discrimination (and retaliation) is his termination from employment.  At his termination he was part of the GTSW.

Plaintiff also faults defendant for failing to offer statistics regarding the sales rankings of those who were subject to the RIF.  As the court discusses further in the context of pretext, plaintiff's argument is a red herring.  The RIF criteria are what they are: plaintiff does not controvert that his "below" rankings put him within the criteria.  And though he argues that these rankings were unwarranted, he does so by pointing to his sales numbers.  He does not offer any evidence to controvert the allegations that he was failing to meet the defendant's procedures and expectations.  Plaintiff's suggestion that sales rankings would reveal a different criteria by which defendant could have or should have conducted the RIF does not create a triable question of fact in this case.

Plaintiff does not offer any evidence other than conclusory speculation that defendant retained or placed a younger employee in a similar position.  There is no competent evidence from which a jury could determine that defendant intended to discriminate against plaintiff in reaching its

RIF decision.  The court determines that plaintiff cannot establish a prima facie case of discrimination under the ADEA and defendant is entitled to summary judgment on this claim.

## 2.     Retaliation Claim

To establish a prima facie age retaliation claim, plaintiff must be able to show that (1) he engaged in protected opposition to discrimination; (2) a reasonable employee would have considered the challenged employment action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action.  *Hinds*, 523 F.3d at 1202 (citing *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007)).  In this action, defendant challenges plaintiff's ability to establish the third element.

Specifically, defendant notes that plaintiff received his 2007 "below" rating and his Final Written Plan—which resulted in "an automatic 'below' rating for 2008,"—several months before he filed his charge with the KHRC.  In other words, both performance factors that resulted in plaintiff's inclusion in the RIF were established *before* plaintiff engaged in the protected activity.

Plaintiff argues that he engaged in protected activity by complaining internally to Jim Tully, Claire Weber, Lisa Lucifero, Tom Starr, and Richard Kaplan.  However, plaintiff offers no evidence to controvert the fact that he never specifically complained in writing of age discrimination until he filed his complaint with the KHRC in September 2008.  (*See* Doc. 25-5 at 10, 12–18; Doc. 35-3 at 3–5, 8, 12–15.)  His internal complaints were that Ms. Soupir's treatment of him was unfair, her criticisms were unwarranted, that she had an "agenda," and, in his response to the Final Written Plan, he suggested that he was the subject of "ongoing harassment."  (*See id.*; Doc. 35-3 at 4–6, 23; Doc. 25-19 at 6.)  Plaintiff testifies in his deposition that he orally raised the possibility that Ms. Soupir was treating him unfairly based on his age to Jim Tully (Ms. Soupir's supervisor) and to Claire Weber (human resources) late in 2007.  (Doc. 35-3 at 14–15, 19–20.)  He states that he also told Lisa

Lucifero (human resources), that he was in a "hostile work environment." (Doc. 35-3 at 25.)  But general allegations of and vague references to harassment, like general complaints about one's own negative performance evaluation, do not constitute protected activity under the ADEA and will not support a retaliation claim where, as here, there is no indication that any misconduct was motivated by age.  *See Hinds*, 523 F.3d at 1203; *Anderson Acad. Sch. Dist. 20*, 1122 F. App'x 912, 916 (10th Cir. 2004).

In a final effort to save his claim, plaintiff suggests that after defendant received notice of the charge, plaintiff was selected for the RIF despite his "stellar sales numbers and [Mr.] Ford's favorable assessment"—specifically that plaintiff had demonstrated "marked improvement."  (Doc. 34, at 34.)   However, stellar sales numbers and Mr. Ford's compliment do not create a genuine issue of fact regarding the "below" ratings that put plaintiff within the RIF.  And in fact, a thorough review of Mr. Ford's September 2008 Field Ride Follow-Up clearly shows that, although Mr. Ford found plaintiff's

> marked improvement . . . good to see . . . it is the continual effort that will need to be observed.  Again, as I stated, the failure on your part to meet expectations set forth by the company warranted a considerable amount of attention and effort on the parts of myself, Mike Doherty, Lisa Lucifero, even the district DST Tim Martinez to address the [gap] in your competencies for the job.  Thus, it will necessitate a continued effort
on your part to change behaviors consistently versus demonstrate the desired behaviors for one day. . . . Steve, I cannot stress enough how serious the situation is currently for you with our company as well as how important it is for you to continue to show the type of effort I observed today.

(Doc. 25-25 at 3.)

In light of the facts properly supported by the record, plaintiff fails to raise an inference that any protected activity was the likely reason for the termination: Although the RIF occurred after plaintiff filed his KHRC charge, the performance ratings that rendered him subject to the RIF were in place many months before the charge was filed.  Plaintiff's retaliation claim fails as a matter of law.

**B.      Legitimate, Nondiscriminatory Reason for Termination**

Because the court finds that plaintiff fails to establish a prima facie case, it need not go further in the analysis.  Nevertheless, plaintiff concedes—and the court agrees—that defendant has met its burden to put forth a legitimate, nondiscriminatory reason for plaintiff's termination.

**C.      Pretext**

Even if plaintiff was able to make out a prima facie case on his discrimination or retaliation claims, he cannot establish pretext.  "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)) (further quotations and citation omitted).

In an RIF case, a plaintiff can establish pretext by showing, among other methods, that: (1) his termination was not in accordance with the RIF criteria allegedly used; (2) his evaluation under the RIF criteria was falsified or manipulated; or (3) the RIF itself was pretextual and the employer was not really reducing its workforce.  *Stone*, 210 F.3d at 1140; *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1168 (10th Cir. 1998).  Plaintiff shows none of these.  He merely asserts that defendant's contention that his performance was deficient when Ms. Soupir was his supervisor is questionable because plaintiff was achieving superior sales numbers.  (*See* Doc. 34 at 31.)  Plaintiff fails to controvert the facts offered by defendant to establish that—sales numbers aside—plaintiff was not meeting the expectations set out in the company's guidelines for sales professionals.

The court has reviewed the evidence offered.  Since 2006, plaintiff was given at least

-10-

fourteen detailed performance warnings and coaching documents based on plaintiff's failure to comply with defendant's Sales Professional Guidelines.  Many of these came from Ms. Soupir, but they also came from Mr. Ford.  Most of them were reviewed and/or approved by other individuals such as Jim Tully, Soupir's supervisor; Mike Doherty, Regional Sales Director; and Richard Kaplan, Claire Weber, and Lucy Lucifero, all of human resources.  And all of them expressed concern about plaintiff's performance; stressed that plaintiff was barely meeting the basic level of sales expectations; and ultimately warned that disciplinary action was a possibility.  (*See, e.g.*, Doc. 25-25.)  Plaintiff does not allege that any of these other individuals "had it in for him" or discriminated against him based on his age.  (*See* Doc. 25-5 at 4.)  And plaintiff does not offer any facts to controvert the allegation that he was failing to meet the expectations set out in defendant's guidelines.  To that extent, he has no basis to argue that his evaluation under the RIF criteria was manipulated.  Where there is no evidence of impermissible motive in defendant's RIF, the fact that plaintiff may have had good sales numbers does not create a genuine issue of material fact for the jury on either plaintiff's discrimination or retaliation claims.  "[An employer] may chose to conduct its RIF according to its preferred criteria of performance . . . and we will not disturb that exercise of defendant's business judgment."  *Beaird*, 145 F.3d at 1169; *Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1403–04 (10th Cir. 1988) ("This court will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives.").

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 24) is granted.

Dated this 27th day of February 2012, at Kansas City, Kansas.

**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**